NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 138

No. 2018-085

| | |
|---|---|
| Annette M. Besaw, Trustee of the Revocable Living Trust of Ernest P. Giroux | Supreme Court |
| | |
| v. | On Appeal from Superior Court, Chittenden Unit, Civil Division |
| | |
| Bryan Giroux | September Term, 2018 |

Robert A. Mello, J.

Kevin E. Brown of Langrock Sperry & Wool, LLP, Middlebury, and Joseph D. Fallon, Hinesburg, for Plaintiff-Appellant.

James W. Runcie of Ouimette & Runcie, Vergennes, for Defendant-Appellee.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **ROBINSON, J.** Trustee appeals from the superior court's ruling on summary judgment that her suit to recover collateral under a security agreement is time-barred. The central issue in this case is when the trustee's right to sue accrued, starting the statute-of-limitations clock. We conclude that trustee's right to sue under the security agreement accrued in 2013 when the borrower failed to pay the balance due on the note within forty-five days of trustee's notice of default and borrower's right to cure. Accordingly, we hold that her suit is not time-barred and reverse and remand.

¶ 2. The relevant facts are not in dispute. Trustee Annette Besaw is the holder of a security interest in fifty shares of stock of the Champlain Bridge Marina, Inc. She acquired the

interest previously held by Ernest Giroux upon his death, in her capacity as trustee of his living trust. Champlain Bridge Marina is a family business in Addison, Vermont. Ernest (defendant Bryan Giroux's grandfather) and Raymond Giroux (defendant's father) started it in 1987. In the beginning, grandfather and father each owned fifty of the Marina's 100 shares. On December 30, 1998, grandfather sold his fifty shares to father in exchange for the promissory note in which father promised to pay grandfather $272,000 plus interest. The associated January 1, 1999 security agreement gave grandfather a security interest in the fifty shares of Marina stock to secure payment on the note.

¶ 3.     The promissory note required father to make monthly payments for thirty years until a maturity date of January 1, 2028, at which point any remaining indebtedness was to become due. It provided generally that "failure to make monthly payments in accordance with the amortization schedule . . .  shall not be considered an event of default, and shall not cause any penalty to accrue." However, if at the end of any year father owed more under the note than was due under the amortization schedule, that overdue balance triggered a penalty. If the overdue balance and penalty were not repaid before the end of the following year, the agreement provided that the nonpayment would constitute a default under the note.

¶ 4.     The note further provided that "[i]n the event default is declared by the Noteholder, Noteholder shall provide written notice to Borrower of the facts and circumstances constituting any such default and shall permit Borrower to cure any such default within forty-five (45) days after Borrower's receipt of said notice of default." It then provided that if the borrower failed to cure, the "Noteholder may, in his sole discretion, declare the amounts due under this Secured Promissory Note immediately due and payable without any further notice or demand, and Noteholder shall then have . . . the rights and remedies of a secured party under the common law and the Uniform Commercial Code of Vermont." The security agreement defined default,

triggering the noteholder's right to accelerate the debt on the note and to pursue the collateral, to include "[f]ailure to pay the Note in accordance with its terms."

¶ 5.    Father never made any payments on his debt under the promissory note. In 2005, father transferred to his son (Ernest's grandson), defendant Bryan Giroux, the fifty shares he had bought from grandfather—the collateral for father's debt to grandfather. The stock certificate issued to grandson states that it is "subject to a chattel mortgage" to grandfather. Grandfather died in 2007, after which trustee held the promissory note and associated security agreement in her capacity as trustee for grandfather's revocable living trust.

¶ 6.    On September 11, 2008, trustee sent father a letter stating that no payments had been made under the note, and $207,440 was due. In the letter the trustee offered to restructure the indebtedness, and concluded by saying it was trustee's "hope and expectation to be able to work with [father] with respect to the repayment of the indebtedness" but that "if something cannot be worked out, [trustee would] resort to the remedies provided in the Secured Promissory Note." Father made no payments.

¶ 7.    On August 20, 2013, trustee sent father a second letter. This letter recounted that "[b]y letter dated September 11, 2008 . . . you were notified of interest and penalties due and owing under your Secured Promissory Note to your father's trust dated December 30, 1998." It went on to say that "you are now in default under the terms of such Promissory Note. Demand is hereby made that all sums due and owing as set forth in the September 11, 2008 letter be paid in full within forty-five (45) days of your receipt of this notice of default." It concluded that if father failed to cure in that time, trustee would declare all amounts due under the note "immediately due and payable without further notice or demand."

¶ 8.    Shortly after the forty-five-day cure period expired without any payments by father, trustee brought suit against father for the entire indebtedness under the note. In 2015, the superior court entered judgment in favor of trustee, ordering father to pay the trust $540,453.

¶ 9. Soon afterward, trustee sent a letter to grandson, citing the court's judgment against father on the note and demanding that grandson give the trust the share certificate that had secured the indebtedness. Grandson did not deliver the share certificate. In May of 2016, trustee filed this lawsuit against grandson, seeking an order compelling delivery of the share certificate, as well as attorney's fees and costs as provided by the security agreement.

¶ 10. Grandson moved for summary judgment, arguing, among other things, that trustee's claim was barred by the general six-year statute of limitations under 12 V.S.A. § 511 because the clock had started running in 2001, when father had first accrued and failed to pay an overdue balance and penalty. Trustee opposed grandson's motion for summary judgment, arguing, among other things, that the fourteen-year statute of limitations under 12 V.S.A. § 508 for witnessed promissory notes applied, and that the statute did not start running until 2013, when trustee sent father the letter declaring him to be in default and offering him forty-five days to cure.

¶ 11. The trial court denied grandson's motion for summary judgment in November 2017. The court concluded that the statute of limitations began to run when trustee sent father the September 2008 letter notifying him of his overdue balance and penalties due. It applied the eight-year statute of limitations for specialties to the security agreement, see 12 V.S.A. § 507, and concluded that trustee's May 2016 suit was not time-barred.

¶ 12. Grandson moved to reconsider, arguing that the court had erred in applying the eight-year statute of limitations for specialties instead of the general six-year limitations period pursuant to 12 V.S.A. § 511. Upon reconsideration, the court concluded that the eight-year limitation for specialties did not in fact apply. Applying the general six-year statute of limitations, and maintaining its already-stated position that the statute began running with trustee's September 2008 letter, the court concluded that the statute did in fact run before trustee's May 2016 lawsuit. It granted summary judgment to grandson.

4

¶ 13.   Trustee moved to reconsider the court's new ruling.  She did not challenge the holding that 12 V.S.A. § 511 governed the action, but argued that trustee's cause of action against grandson did not accrue until forty-five days after trustee's October 2013 letter to father declaring a default and notifying him of his opportunity to cure.  The court denied trustee's motion.  It reasoned that trustee had failed to properly preserve the argument, and also rejected trustee's argument on the merits.  Citing the provision in the promissory note that failure to repay the overdue balance and penalty within a year would constitute a default, the court ruled that the six-year limitations period began running one year after the trustee's September 2008 letter to father when father failed to pay the sums due.  This one-year shift in the trial court's determination of the starting point for the six-year limitations period did not save trustee's May 2016 suit against grandson.  Accordingly, the court denied trustee's motion to reconsider and left its summary judgment for grandson in place.

¶ 14.   On appeal, neither party challenges the trial court's ultimate application of the six-year general statute of limitations for civil actions.  See 12 V.S.A. § 511.  Instead, they disagree about when the statute began to run.

¶ 15.   Trustee argues that under the terms of the promissory note and accompanying security agreement, her right to sue to enforce the chattel mortgage did not accrue until 2013, when trustee formally declared a default and demanded payment and father failed to pay within the forty-five-day cure period.  Because the six-year statute did not begin to run until 2013, trustee contends her May 2016 action to collect the collateral was timely.

¶ 16.   Grandson argues that trustee did not properly preserve the argument that the statute did not begin to run until 2013, asserting that trustee did not make that argument until the second post-judgment motion for reconsideration.  On the merits, grandson argues that the right to bring an action to collect collateral accrues when there is a default.  Because, under the security agreement, a default was defined as "[f]ailure to pay the Note in accordance with its terms," he

5

argues father's default in this case—and thus grandfather's and later the trust's right to sue for the collateral—accrued as early as 1999, when father failed to begin making payments pursuant to the terms of the note. Grandson contends that the latest time the statute could have begun running was following father's failure to make any payments on the note after the trustee's September 2008 formal demand for payment. Even starting the clock at the latest possible time—one year from the September 2008 demand for payment—he argues the six-year limitations period had run before trustee filed this action in May 2016.

¶ 17. This Court reviews summary judgment decisions without deference, applying the same standard as the trial court. Lyons v. Chittenden Cent. Supervisory Union, 2018 VT 26, ¶ 12, __ Vt. __, 185 A.3d 551. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a). The issues in this appeal turn on the meaning of the terms in the promissory note and security agreement, and whether under those terms trustee's claim to recover the collateral is barred by the applicable statute of limitations. These are questions of law that we review without deference to the trial court. See Rounds v. Malletts Bay Club, Inc., 2016 VT 102, ¶ 16, 203 Vt. 473, 157 A.3d 1101 ("Generally, the proper interpretation of a contract is a question of law, which we review without deference.").

¶ 18. We conclude that trustee's claim is not time-barred. The statute of limitations begins to run when a party's right to sue accrues—an event that is not always the same as the date of default. In assessing when trustee's right to sue for return of the collateral accrued in this case, we consider in tandem the plain language of the security agreement and the promissory note to which it was closely tied. We conclude that a cause of action under the security agreement for return of the collateral did not arise until the noteholder declared a default and provided notice of the forty-five-day cure period, and the borrower then failed to pay. Applying the contractual requirements to the facts in this case, the trustee's right to sue to enforce the security agreement

6

accrued in 2013 when father failed to make any payments on the note after the trustee declared the default and gave father forty-five days to cure.[1]

¶ 19. The statute of limitations begins to run when a party can sue on a cause of action. See Blanche S. Marsh Inter Vivos Tr. v. McGillvray, 2013 VT 6, ¶ 15, 193 Vt. 320, 67 A.3d 943 ("The statute of limitations begins to run when a party can first sue on the cause of action." (alterations omitted) (citing White v. White, 136 Vt. 271, 273, 388 A.2d 386, 388 (1978))); see also Furlon v. Haystack Mountain Ski Area, Inc., 136 Vt. 266, 270, 388 A.2d 403, 406 (1978) ("The statute of limitations runs from the time when a plaintiff can first sue and recover [a] demand.").

¶ 20. The date the cause of action accrues is not necessarily the date of default; if the parties agree to make a default actionable only upon certain conditions, the statute of limitations will not start to run until those conditions are satisfied. See C & T Disc. Corp. v. Sawyer, 123 Vt. 238, 241–42, 185 A.2d 462, 465 (1962). In C & T Discount Corp., we considered when the statute of limitations began running on a payee's right to sue for nonpayment on a note. Much of the Court's discussion focused on when the right to sue arose under the specific language of the note in question. We explained, "[e]ven in the case of a demand note, limitations do not run if there is something in the note or in the circumstances under which it was given showing that actual demand or delay for payment was contemplated by the parties." Id. at 240-41; 185 A.2d at 464.

---

[1] We reject grandson's claim that trustee did not preserve the argument that the statute of limitations did not begin running until 2013. In briefing the summary-judgment motion below, the parties both focused primarily on the applicable statute of limitations. The trial court's initial decision denying grandson's motion for summary judgment, and its first decision on reconsideration granting that motion, likewise focused primarily on the applicable limitations period. But the date the statute began to run was also a point of contention throughout the briefing. In opposition to grandson's motion for summary judgment and thereafter, trustee consistently argued that the statute of limitations began running in 2013 after trustee declared a default and father failed to pay within the forty-five-day cure period. If "a litigant's argument is clear enough for the trial court to evaluate it and for an opponent to respond to it, the claim is adequately preserved for appeal." Avery v. Avery, 2018 VT 59, ¶ 9 n.3, __ Vt. __, 192 A.3d 1250. Trustee preserved the argument for appellate review.

Accordingly, we must consider when, given the particular note and security agreement at issue in this case, trustee's actual cause of action to recover the collateral arose—a question that may or may not be the same as when father was in default under the terms of the note.

¶ 21.    We interpret the promissory note and security agreement as we do all contracts; our goal is to effectuate the parties' intent as expressed in their writing, according, whenever possible, to the plain meaning of the contract language.  See Southwick v. City of Rutland, 2011 VT 53, ¶ 4, 190 Vt. 106, 35 A.3d 113.

¶ 22.    Moreover, where parties execute multiple instruments at the same time for the same purpose, such as a promissory note and a security agreement, we read them together to discern the parties' intent.  Island Pond Nat. Bank v. Lacroix, 104 Vt. 282, 294-95, 158 A. 684, 690 (1932) ("When . . . the original note and mortgage were made at the same time, and in relation to the same subject, they are to be construed together as if they were parts of the same instrument . . . ."); see also Rounds, 2016 VT 102, ¶ 20 ("Instruments executed as part of the same transaction should be read together to discern the intent of the parties."); O'Brien Bros.' P'ship v. Plociennik, 2007 VT 105, ¶ 15, 182 Vt. 409, 940 A.2d 692 ("[T]wo instruments dealing with the same subject matter [which] are executed at the same time by the same parties . . . should be construed together."); 11 R. Lord, Williston on Contracts § 30:26 (4th ed. 2018) ("[A]bsent anything to indicate a contrary intention, written instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract . . . .").

¶ 23.    Reading the promissory note and security agreement together, and according to their plain language, we conclude that the right to sue for return of the collateral securing the note does not accrue until the borrower fails to pay the amounts due under the note forty-five days after trustee's declaration of default and notice of the right to cure.  This conclusion follows from the

8

plain terms of the promissory note, and our construction of the associated security agreement in light of the terms of the promissory note.

¶ 24. The promissory note does not confer on the noteholder a right to sue, or collect the collateral, solely on the basis of a default by the borrower. Instead, the note defines default to include failure to pay all sums due at maturity; failure to pay an overdue balance and penalty within a year from the date they are established;[2] initiation of bankruptcy proceedings; and default under a security agreement. The note then expressly provides:

> In the event default is declared by the Noteholder, Noteholder shall provide written notice to Borrower of the facts and circumstances constituting any such default and shall permit Borrower to cure any such default within forty-five (45) days after Borrower's receipt of said notice of default. In the event Borrower fails to cure any such default within the time period provided herein, Noteholder may, in his sole discretion, declare the amounts due under this Secured Promissory Note immediately due and payable without further notice or demand, and Noteholder shall then have in any jurisdiction where enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the common law and the Uniform Commercial Code of Vermont. [Emphasis added].

Accordingly, it is clear that trustee could not have sued father on the note merely on the basis of a default under the note. Before suing, trustee, as the noteholder, was first required to declare a default and to give father, as the borrower, notice of the default and the right to cure within forty-five days. Any suit before these conditions were satisfied would have been premature. This arrangement may be less common than a regime in which the cause of action for nonpayment accrues upon default, but it makes sense in the context of this intra-family deal. The parties'

---

[2] As set forth above, the note provided that the failure to pay according to the amortization schedule was not itself a default, but that the failure to pay an overdue balance that existed as of January 1 of each year, and the associated penalty, by January 1 of the following year did constitute a default. The parties disagree as to whether this provision is self-executing such that the default arises automatically from the fact of nonpayment without any action by the noteholder, or whether it requires an action of the noteholder to affirmatively "establish" the outstanding balance and penalty as of a particular January 1. Because our analysis does not turn on whether and when father was "in default" under the note, we need not resolve this dispute.

arrangement provides extra protection for both parties—giving the noteholder the discretion to decide whether and when to declare a default and trigger the cure period, and giving the borrower an opportunity to cure.

¶ 25. The declaration, notice, and opportunity-to-cure conditions apply equally to a suit pursuant to the security agreement to collect the collateral that is predicated on a failure to pay sums due under the note. The security agreement identifies seven events that constitute defaults under the security agreement, and the form language provides that upon default the secured party may accelerate the note and exercise the rights with respect to the collateral that are afforded a secured party under the Uniform Commercial Code. The only event of default (as defined in the security agreement) that is potentially applicable here is "[f]ailure to pay the Note in accordance with its terms." We conclude that the right to sue to recover the collateral under the security agreement pursuant to this provision is subject to the same notice-and-opportunity-to-cure requirement set forth in the note. We base our conclusion on several considerations.

¶ 26. First, the provision in the security agreement defining default as it relates to nonpayment on the note essentially incorporates by reference the requirements of the note itself, defining default as failure to pay the note "in accordance with its terms." (Emphasis added). The definition of "default" under the security agreement as it relates to a failure to pay on the note is thus informed by the terms of the note.

¶ 27. Second, the note requires the notice and opportunity to cure not only as a condition of the noteholder's right to sue on the note, but also as a prerequisite to exercise of "the rights and remedies of a secured party under the common law and the Uniform Commercial Code of Vermont." The plain language of the note expressly requires the forty-five-day notice and opportunity to cure before the noteholder can pursue the security under the note. Grandson's reading, pursuant to which the security agreement independently affords a right to accelerate the sums due under the note and collect the collateral upon a failure to pay, without any notice and

10

opportunity to cure, would create a square conflict between the terms of the note and the terms of the security agreement.[3]  In interpreting contracts, we try to "form a harmonious whole from the parts," recognizing that "an interpretation which harmonizes all parts of the contract is preferable to an interpretation which focuses on one provision heedless of context." In re Verderber, 173 Vt. 612, 615, 795 A.2d 1157, 1161-62 (2002) (mem.) (quotation omitted). We will not read one provision of the security agreement out of context as creating conflict with the note when we can read them as "a harmonious whole." Id. 173 Vt. at 615, 795 A.2d at 1161.

¶ 28.   Third, given the language of these instruments, where the action to collect the collateral is based on nonpayment of the note, as contrasted with, for example, an action impairing the collateral, the more reasonable interpretation is that a noteholder's right to sue for payment on the note and the noteholder's right to initiate an action to recover the collateral accrue at the same time.  Otherwise, the borrower's right to notice and opportunity to cure would be meaningless. The noteholder could seize the collateral without giving the borrower any time to cure, and without even establishing a default as defined under the note.  This scenario defies a straightforward reading of the note and security agreement.

¶ 29.   Applying these considerations to the undisputed evidence here, we conclude that the statute of limitations did not begin to run until 2013, when father failed to pay the balance due forty-five days after the trustee declared a default and gave father notice of his opportunity to cure. We reject grandson's argument that trustee's 2008 letter served as the requisite notice of default and opportunity to cure, such that father's failure to pay after forty-five days triggered the statute

---

[3] For the reasons set forth above, we do not believe the requirements in the two documents actually conflict.  If they did, however, the terms of the customized typewritten promissory note would trump the generic provision in the form security agreement. See 5 T. Murray, Corbin on Contracts § 24.24 (2018) (explaining that where parties' agreement is laid out in both a standardized preprinted form and handwritten or typewritten provisions, they should be interpreted together, but if there is conflict or inconsistency between them, "handwritten provision prevails over a typewritten or printed term, and a typewritten provision prevails over a printed term").

of limitations. Trustee's 2008 letter simply stated that no payment had been made under the promissory note, laid out the amounts currently due at that time, and offered to restructure the debt. It did not declare default or notify father that he had forty-five days to cure. In contrast, the 2013 letter declared "you are now in default . . . . Demand is hereby made that all sums due and owing as set forth in the September 11, 2008 letter be paid in full within forty-five (45) days of your receipt of this notice of default." This fulfilled each of the preconditions to suit laid out in the promissory note—written notice outlining the facts underlying the default and providing a forty-five-day cure period. Under the parties' agreement, once trustee sent her 2013 letter declaring default and providing a forty-five-day cure period, and father failed to cure, trustee gained "the rights and remedies of a secured party."

¶ 30.    As trustee filed this case in May 2016, less than three years after father's failure to pay the balance within forty-five days of trustee's 2013 letter, the action is not time-barred.

Reversed and remanded for further proceedings not inconsistent with this opinion.

FOR THE COURT:

_____

Associate Justice

12